UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                               :
BE LABS, INC.,                          :

                      Plaintiff,   :

                                 :          24 Civ. 3643 (LGS)
          -against-            :

                                 :      **OPINION & ORDER**
UBIQUITI INC.,               :

                   Defendant.  :
-----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

Plaintiff BE Labs, Inc. ("BE Labs" or "Plaintiff") alleges that Defendant Ubiquiti Inc.

("Ubiquiti" or "Defendant") infringes U.S. Patent Nos. 7,827,581 (the "'581 Patent") and

9,344,183 (the "'183 Patent") (collectively, the "BE Labs Patents").  The parties have presented

their proposed constructions of ten disputed claim terms pursuant to *Markman v. Westview*

*Instruments, Inc.*, 517 U.S. 370 (1996).  Having considered the parties' submissions and

arguments, the relevant law and the record in this case, the disputed terms are construed as set

forth below.

## I.    BACKGROUND

###     A.  The BE Labs Patents

The BE Labs Patents are both titled "Wireless Multimedia System" and pertain to

wireless multimedia distribution systems for sending video signals and broadband data to

different devices in a building (e.g., streaming content across multiple devices located in

different rooms).  A central hub receives signals from satellites, cable and telephone or data lines,

and redistributes segments of the signals to the various devices via a transmitter.  The BE Labs

Patents teach that video signals are transmitted in a different manner from TV and data

("broadband") signals.  Video signals are transmitted to one end unit, while broadband signals

are transmitted to a separate end unit.  The central hub transmits video signals on designated radio frequency channels ("RF channels"), resulting in "one-way" data traffic; transmission continues regardless of whether the receiving device responds.  In contrast, the broadband signals are transmitted using bi-directional communication, which involves handshaking mechanisms or "two-way" acknowledgment protocols as the receiving device transmits acknowledgment back to the central hub.  Figure 2 of the '581 Patent illustrates one embodiment of the system, showing separate antennas for one-way broadcast and two-way communication.



## B.  Procedural History

BE Labs first filed Provisional Patent Application No. 60/185,862 on February 29, 2000. A provisional application provides a priority date for later applications, and both the '581 and '183 Patents claim priority to this filing.  BE Labs then filed the parent non-provisional

application for the '581 Patent on February 28, 2001.  After an initial rejection by the examiner, which the Board of Patent Appeals and Interferences ("BPAI") -- a precursor to the Patent Trial and Appeal Board -- reversed on appeal, the '581 Patent issued on November 2, 2010.  BE Labs filed a child application on October 1, 2010.  The continuation patent, Patent '183, issued on May 17, 2016.

### C.  The Parties' Core Dispute

While the parties dispute ten claim terms, their disagreement centers on whether the channels for video covered by the BE Labs Patents can ever carry two-way data traffic as depicted in Figure 1 of the Provisional Patent Application.



Figure 1

In Plaintiff's view, if a broadcasting channel is not transmitting video, that channel may be used for another purpose -- including operations that require two-way traffic. Put differently, Plaintiff argues that a channel for video may be used for two-way communication, as long as at least one of the RF channels is dedicated to video transmission for the periods of time it transmits video. Defendant disagrees, arguing that the patentee expressly disclaims any use of broadcast channels for two-way traffic, and that such channels must be physically and functionally separate from paths used for broadband communication.

## II.   LEGAL STANDARD

### A.  Claim Construction

"'[T]he construction of a patent, including terms of art within its claim, is not for a jury but exclusively for the court to determine." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015) (quoting *Markman*, 517 U.S. at 390).[1] "[A] district court's duty at the claim construction stage is . . . to resolve a dispute about claim scope that has been raised by the parties." *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016); *Zeta Glob. Corp. v. Maropost Mktg. Cloud, Inc.*, No. 20 Civ. 3951, 2021 WL 2823563, at *2 (S.D.N.Y. July 7, 2021). "This means that, as to claim coverage, the district court must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to intelligently determine the questions presented." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004); *Zeta Glob. Corp.*, 2021 WL 2823563, at *2. In the event "the parties [choose] to treat [certain] terms across [separate] patents as rising and falling together" district courts need not "separately address [every] Patent." *X2Y*

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted and all alterations are adopted.

*Attenuators, LLC v. Int'l. Trade Comm'n*, 757 F.3d 1358, 1363 n.2 (Fed. Cir. 2014); *Kewazinga Corp. v. Microsoft Corp.*, No. 18 Civ. 4500, 2019 WL 3423352, at *2 (S.D.N.Y. July 29, 2019).

During claim construction, the court looks "first to intrinsic evidence, and then, if necessary, to the extrinsic evidence." *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 785 (Fed. Cir. 2019). The intrinsic record includes the claims, specification and prosecution history. *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023). Central to this inquiry is the claim language, for "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Claim terms are presumed to be given their "ordinary and customary meaning" as understood by a "person of ordinary skill in the art" as of the patent's priority date. *Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022 (Fed. Cir. 2020). When the ordinary meaning of the claim language is "readily apparent even to lay judges," claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-62 (Fed. Cir. 2008); *accord Green Pet Shop Enters., LLC v. Euro. Home Design, LLC*, No. 17 Civ. 6238, 2019 WL 1172069, at *4 (S.D.N.Y. Mar. 13, 2019).

If a claim term does not have an ordinary meaning, it must "be read in view of the specification." *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019); *accord Zeta Glob. Corp.*, 2021 WL 2823563, at *2. "[T]he specification is key -- it is highly relevant to the claim construction analysis and the single best guide to the meaning of a disputed term." *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1218 (Fed. Cir. 2020). In addition to the specification, "a court should also consider the patent's prosecution history, if it is in

5

evidence." *Cont'l Cirs. LLC*, 915 F.3d at 796; *accord Zeta Glob. Corp.*, 2021 WL 2823563, at *2.  "Like the specification, the prosecution history provides evidence of how the United States Patent and Trademark Office ("PTO") and the inventor understood the patent." *Cont'l Cirs. LLC*, 915 F.3d at 796.  But "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*  The prosecution history of any parent or grandparent application may also be considered as intrinsic evidence in the claim construction of a child application unless the patentee expressly recaptures the disclaimed scope.  *See Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007); *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006); *Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1300-01 (Fed. Cir. 2001).

Secondary to intrinsic evidence is extrinsic evidence.  Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317; *accord Personalized Media Commc'ns, LLC v. Netflix Inc.*, No. 20 Civ. 3708, 2020 WL 5026600, at *6 (S.D.N.Y. Aug. 25, 2020).  "[W]hile extrinsic evidence can shed useful light on the relevant art . . . it is less significant than the intrinsic record in determining the legally operative meaning of disputed claim language." *Cont'l Cirs. LLC*, 915 F.3d at 799.  "Extrinsic evidence may be used only to assist in the proper understanding of the disputed limitation; it may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977-78 (Fed. Cir. 2014); *accord Personalized Media Commc'ns, LLC*, 2020 WL 5026600, at *6.

6

### i. Prosecution Disclaimer

Sometimes in claim construction, the prosecution history may result in a narrower claim construction than would be expected from the claim language alone. *See UCB, Inc. v. Yeda Rsch. & Dev. Co.*, 837 F.3d 1256, 1259-61 (Fed. Cir. 2016) (narrowing scope of claim language in light of prosecution history). Under the doctrine of prosecution disclaimer, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). The doctrine serves the public notice function of claim construction by preventing patentees from recapturing through litigation what they relinquished during prosecution. *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022). To invoke disclaimer, the patentee's statements must be "clear and unmistakable" as courts will not apply disclaimer based on ambiguous or equivocal remarks. *Id.*; *Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1358 (Fed. Cir. 2017). If established, disclaimer limits the scope of disputed claim terms to a narrower interpretation consistent with the patentee's representations to the Patent Office. *Omega Eng'g, Inc.*, 334 F.3d at 1324.

## III.   DISCUSSION

The parties seek claim construction. Plaintiff initially identified twenty-nine terms for construction. The parties then designated ten of these terms that they dispute. *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy,

and only to the extent necessary to resolve the controversy.").  The first six disputed terms appear

in Claim 1 of the '581 Patent, and the remaining four appear in Claim 1 of the '183 Patent.

### A.  The '581 Patent "Broadcast & Broadband Communication" Terms

Claim 1 of the '581 Patent states:

> We claim:
>
> 1. A customer premises system in which:
> the terms:
>> a digital data packet is: a container of data defined by boundaries set
>> according to a protocol;
>> communicate is: to transmit digital data packets bi-directionally, with a
>> hand-shaking mechanism for each digital data packet;
>> **broadcast is: to transmit digital data packets in one direction, with no
>> hand-shaking mechanism for each digital data packet**;
> including:
> a wireless multimedia center (WMC) for reception on said premises from one or
> more signal sources and for distribution of segments of signals from said
> signal sources through the wireless multimedia center
> to a plurality of end units, in which:
> the signals include video and/or **audio signals** (hereinafter video) and/or
> **broadband communication data**;
> the wireless multimedia center receives all the signals and distributes segments of
> said signals via a transmitter,
> the **video signals** are broadcast by orthogonal frequency division multiplexing
> (OFDM) in which all signals are added together and summed as an
> orthogonal array having dimensions of time, frequency and amplitude, to
> transmit spread spectrum multiplexed signals, in which each pulse including
> said signals has sufficiently long individual pulse widths to defeat multi-path,
> reflection and absorption phase induced losses;
> . . . .

#### i.  "broadcast is: to transmit digital data packets of data in one direction, with no hand-shaking mechanism for each digital data packet"

With respect to the claim term "broadcast is: to transmit digital data packets of data in

one direction, with no hand-shaking mechanism for each digital data packet," BE Labs contends

that the term should be construed according to its plain and ordinary meaning.  Defendant argues

that the term should be construed to mean the following, "broadcast is: to transmit <u>all</u> digital data

packets of data in one direction, with no hand-shaking mechanism for <u>any</u> digital data packet <u>without using a network protocol</u>."  Defendant argues that the doctrine of prosecution disclaimer justifies importing the underlined limitations into the claim language.  For the reasons below, this argument is unpersuasive.  The term is construed as "broadcast is: to transmit digital data packets of data in one direction, with no hand-shaking mechanism for each digital data packet," which is the express definition of the word "broadcast" in the patent.  This construction is also consistent with, but not identical to, that recently adopted by the Western District of Texas in parallel litigation brought by BE Labs alleging infringement of the BE Labs Patents (the "Texas case"). *See BE Labs, Inc. v. Asustek Computer Inc.*, No. 23 Civ. 56, ECF No. 56, at 5-6 (W.D. Tex. May 15, 2025) (same as above but deleting the words "of data").

The claim language compels this construction.  Here the patentee acted as its own lexicographer, defining three terms, including "broadcast."  The patent's definition of "broadcast" can and should be as stated in the patent, according the words in the definition their plain and ordinary meaning, and not the more limited expression that Defendant proposes. Because the patentee set out a clear definition of the term "broadcast" in the body of the claim, applying the plain meaning of the definitional language is appropriate absent compelling arguments for disclaimer.  *See, e.g.*, *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term . . . ."); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) ("When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls."); *Renishaw PLC v. Marposs Società per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (explaining that where the patentee acts as his own lexicographer, "the definition selected by the patent applicant controls"); *Multiform Desiccants,*

*Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998) ("When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term."); *Phillips*, 415 F.3d at 1321 ("specification acts as a dictionary when it expressly defines terms used in the claims").  The Federal Circuit's rule that a patentee may act as its own lexicographer does not turn on whether the definition appears in the specification; what matters is that the patentee "clearly set forth a definition of the disputed claim term." *Thorner*, 669 F.3d at 1365-66.  That standard is satisfied where, as here, the definitional language is written into the claim itself.

Defendant's argument that the doctrine of prosecution disclaimer mandates a narrower construction is unpersuasive.  Although "clear and limiting statements made by the patent owner can give rise to disclaimer," such statements "do not . . . where those statements were clearly and expressly rejected by the Patent Office."  *Galderma Lab'ys., L.P. v. Amneal Pharms. LLC*, 806 F. App'x 1007, 1010-11 (Fed. Cir. 2020) (non-precedential) ("Because the record makes clear to a skilled artisan that Patent Owner's arguments were rejected, those arguments do not impact claim scope.").  District courts applying the same principle have declined to find disclaimer based on arguments the PTO or BPAI expressly refused to adopt.  *See, e.g., Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp. 3d 851, 864 (N.D. Cal. 2019); *Motiva Pats., LLC v. Sony Corp.*, No. 18 Civ. 180, 2019 WL 3933670, at *19-21 (E.D. Tex. Aug. 20, 2019); *Vertical Tank, Inc. v. BakerCorp*, No. 18 Civ. 145, 2019 WL 2207668, at *11-12 (E.D. Cal. May 22, 2019).

Here, during patent prosecution, Plaintiff made numerous statements emphasizing that the invention transmitted video and audio signals separately from broadband communication data.  Plaintiff explained that the invention "put[s] aside the video and audio" for "one-way

transmission, without a LAN protocol," while two-way Internet traffic used handshaking protocols. But in its July 2009 opinion, the BPAI rejected the Plaintiff's narrow interpretation that "'broadcast' should be interpreted as one-way communication." The BPAI explained that the claim language could be interpreted as broad enough to encompass RF channels that serve multiple functions, including uses beyond one-way broadcast when not actively transmitting video or audio.

Although the same interpretation standard does not apply here, the BPAI's decision put Plaintiff, the examiner and the public on notice that the claim encompassed more than a single-purpose, broadcast-only channel. *Compare In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259-60 (Fed. Cir. 2010) (explaining that, in PTO proceedings, claims are given their "broadest reasonable construction consistent with the specification"), *with Phillips*, 415 F.3d at 1312-13 (stating that district courts construe claims according to the "ordinary and customary meaning" to a person of ordinary skill in the art in question, in light of the specification and prosecution history); *see Galderma*, 806 F. App'x at 1010-11 (explaining that the BPAI's rejection of a proposed narrowing construction "clearly put the public on notice" that the claim term "is not limited" in that manner). Plaintiff then had the opportunity to revise the claim to reflect a narrower scope before the patent issued, but did not do so. Instead, Plaintiff incorporated in the patent a definition of "broadcast" that referred to one-way transmission without handshaking, but did not exclude other uses of the channel or preclude the use of two-way communication protocols. The patent, as issued, contains this definition. The decision not to exclude other uses of the channel or preclude the use of two-way communication protocols, despite knowing the BPAI's interpretation, undercuts the conclusion that a narrower construction was intended and weighs against finding a clear and unmistakable disclaimer. *See id*.

11

The only evidence of disclaimer Defendant identifies post-BPAI opinion (i.e., after Plaintiff was on notice of the claim's broader scope) is a November 2009 Office Action Response, in which Plaintiff described video signals as broadcast over "separate and dedicated RF channels," distinct from two-way data traffic. But this Office Action Response, even read in isolation, does not foreclose the use of a broadcast channel for other purposes at other times. Defendant's simultaneous assertion that further limitations must be imported into the claim language to reflect the intended scope underscores the ambiguity of any purported disclaimer. Courts "decline[] to apply the doctrine of prosecution disclaimer where the alleged disavowal of claim scope is ambiguous." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

To the extent Defendant invokes the public notice function of disclaimer, that function was fulfilled by the BPAI decision, which notified both the applicant and the public that the broader construction was permissible. *See Galderma*, 806 F. App'x at 1010-11 ("Because the Board rejected the Patent Owner's arguments regarding the meaning of [the disputed term], the record before the Patent Office clearly put the public on notice that the meaning of [the disputed term] . . . [was] not limited [by the Patent Owner's potential disclaimer]."). It would undermine both equity and predictability to bind applicants to narrowing statements that the Patent Office rejected, particularly where, as here, the BPAI clarified the claim's permissible breadth before the patent issued.

The meaning of "broadcast" is clearly and deliberately defined in the claim. The intrinsic record does not support that the patentee intended to depart from that definition. Because the claim expressly defines the term "broadcast," that definition governs, without the limitations or exclusion of network protocol use proposed by Defendant.

### ii. "video signal"

BE Labs contends that the term "video signal" should be construed to mean "a transmission containing visual content.'" Ubiquiti contends that the term should be construed to mean "not 'broadband communication data.'" For the reasons below, "video signal" is construed to mean "a transmission containing visual content and/or audio content."[2]

While Plaintiff proposes "a transmission containing visual content," Claim 1 defines "video" explicitly and more broadly: "signals [that] include video and/or audio signals (hereinafter video)." Because the patentee acted as its own lexicographer in defining the term "video," that definition is adopted. This construction encompasses visual content, audio content or both visual and audio content together.

Ubiquiti's proposed construction -- "not 'broadband communication data'"-- separately fails. Defendant argues that "video signals" and "audio signals" are distinct from "broadband communication data" and should be construed with that limitation. Defendant's assertion that the terms are distinct is correct based on the claim language: "signals include video and/or audio signals (hereinafter video) and/or broadband communication data." But since the distinction is evident from the claim language itself, the terms need not be defined to incorporate the distinction. Defendant's further argument that the patent treats differently these two types of transmissions -- video/audio signals versus broadband communication data -- while also correct, does not bear on the construction of any of these terms.

---

[2] This construction is somewhat different from the construction of "video signal" in the Texas case. *See BE Labs, Inc.*, ECF No. 52, at 11-12 ("a transmission containing visual content or audio content").

### iii.  "audio signal"

BE Labs contends that the term "audio signal" should be construed to mean "a transmission containing sound content."  Ubiquiti again contends that the term should be construed to mean "not 'broadband communication data.'"  For the reasons below, "audio signal" is construed to mean "a transmission containing sound content."[3]

As used in the claim, "audio signal" is a parallel term to "video signal."   Just as "video signal" refers to a transmission containing a type of content, "audio" signal also refers to a transmission containing a type of content.  Adopting its plain meaning, "audio" content denotes sound content.  *See Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003) (stating that absent an "express intent to impart a novel meaning," claim terms "are presumed to take on the[ir] ordinary and customary meanings").  The term "audio signal" is used in the claim primarily to define "video signal" as including either or both video or audio content, as discussed above.

### iv.  "broadband communication data"

BE Labs contends that the term "broadband communication data" should be construed to mean "data transmitted via broadband."  Ubiquiti argues that the term does not need to be construed.  The term requires construction because it incorporates a derivative of the term "communicate," which is explicitly defined in the patent with the patentee acting as lexicographer.  *See O2 Micro*, 521 F.3d at 1362 (explaining that when the parties present a "fundamental dispute regarding the scope of a claim term," the court must resolve it by claim construction); *Phillips*, 415 F.3d at 1316 (stating that where the patentee acts as its own

---

[3] This construction is the same as the construction of "audio signal" in the Texas case. *See BE Labs, Inc.*, ECF No. 52, at 12.

lexicographer, "the inventor's lexicography governs" the construction).  Incorporating that definition of "communicate," the term "broadband communication data" is construed to mean "data transmitted via broadband bi-directionally, with a hand-shaking mechanism for each digital data packet."

The term is used in Claim 1, which describes the transmission of "signals includ[ing] video and/or audio signals . . . and/or broadband communication data."  Read in context, "broadband communication data" describes data, distinct from video and audio signals, that is transmitted via "broadband communication."  "Communicate" is one of the three terms that Claim 1 expressly defines -- "Communicate is: to transmit digital data packets bi-directionally with a hand-shaking mechanism for each digital data packet."  This definition dictates the construction of "broadband communication data" to mean "data transmitted via broadband bi-directionally, with a hand-shaking mechanism for each digital data packet."  That "communication data" is tied to the definition of "communicate" is confirmed by the Claim 5 language that "the wireless multimedia center transmits broadband data signals to the communications end unit."  Taken together, these disclosures support construing "broadband communication data" to mean "data transmitted via broadband bi-directionally, with a hand-shaking mechanism for each digital data packet."

### B.  The '581 Patent "Channel" Terms

Claim 1 of the '581 Patent states:

> We claim:
>
> 1. A customer premises system in which:
> the terms:
>> a digital data packet is: a container of data defined by boundaries set according to a protocol;
>> communicate is: to transmit digital data packets bi-directionally, with a hand-shaking mechanism for each digital data packet;

> broadcast is: to transmit digital data packets in one direction, with no hand-shaking mechanism for each digital data packet;
>
> including:
>
> . . .
>
> the video signals are broadcast from the wireless multi media center via **one or more separate and dedicated RF channels to one or more end units**:
>
> and
>
> optionally, the end units communicate simultaneously with the wireless multimedia center, via a separate bi-directional wideband data pipe (WDP) which provides, as demanded, control for the **video channels**, data transfer, or plain old telephone service, wherein said wireless multimedia center controls which segments of which signals are distributed to each end unit; the video signals are broadcast independently without the presence of communication signals and/ or are broadcast simultaneously with the communication signals.

### i. "one or more separate and dedicated RF channels to one or more end units"

The parties seek construction of the term "one or more separate and dedicated RF channels to one or more end units." BE Labs contends that the term should be construed to mean "one or more separate RF channels dedicated for transmission to one or more end units." Ubiquiti contends that the term should be construed to mean "one or more [RF channels] separate from the bi-directional wideband data pipe and dedicated to broadcasting [video signals]." For the reasons below, "one or more separate and dedicated RF channels to one or more end units" is construed to mean "one or more wireless frequency bands, distinct from each other, reserved for transmission to one or more end units."[4]

---

[4] A similar term, "separate and dedicated RF channels," was disputed in the Texas case. There, the court adopted the construction: "defined channels used for wireless transmission of the video signals." *BE Labs, Inc.*, ECF No. 52, at 6. In doing so, the court rejected defendant's proposed construction, which mirrors Ubiquiti's proposed construction here. *Id.* ("one or more [RF channels] separate from the bi-directional wideband data pipe and dedicated to broadcasting [video signals]"). The court also rejected plaintiff's alternative proposal, "temporarily defined channels within the RF signal used for wireless transmission of the video signals." *Id.*

The parties agree that "RF channel" means "a defined frequency band used for wireless transmission of signals."  At issue is the meaning of "separate" and "dedicated."  The phrase "separate and dedicated RF channels" requires construction because the parties dispute its meaning.  *See O2 Micro*, 521 F.3d at 1361-62.  "[S]eparate" and "dedicated" are different terms with distinct meanings.  *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different meanings, not that they necessarily refer to two different structures."); *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

Claim 1 uses the phrase "separate and dedicated RF channels" to explain how "video signals are broadcast" -- i.e., "via one or more separate and dedicated RF channels to one or more end units."  A plain reading of the claim language indicates that "separate" modifies "RF channels."  Thus "separate RF channels" refers to distinct frequency bands.  Defendant's proposed construction, that RF channels are "separate from the bi-directional wideband data pipe," is not a part of the plain meaning of "separate RF channels" used to broadcast signals as used in Claim 1, but rather, relates to another part of the claim.

Similarly, the phrase "dedicated RF channels" addresses how the RF channels are used. Claim 1 immediately follows that phrase with the words "to one or more end units," a phrase that indicates that the channels are reserved for transmitting signals to those end units.  Defendant's alternative construction that "dedicated" means "dedicated to broadcasting video signals" finds no support in the text, as the claim language does not require that the channels be dedicated to video signals as opposed to other types of data.  Therefore, the instant terms are construed to

mean "one or more wireless frequency bands, distinct from each other, reserved for transmission to one or more end units."

Ubiquiti's reliance on prosecution statements does not meet the "clear and unmistakable" standard for disclaimer.  In prosecuting the patent, Plaintiff argued these channels are "separate from the LAN" and "dedicated to . . . video."  But those statements do not meet the "clear and unmistakable" standard required to limit claim scope given the BPAI's rejection of the patentee's narrow interpretation.  *See supra* III.A.i.  Setting aside statements made before the BPAI decision -- i.e., before Plaintiff was on notice of the Board's broader interpretation of the claim -- the record contains no "clear and unmistakable" disclaimer that would narrow the construction of "one or more separate and dedicated RF channels to one or more end units."  Consequently, the plain meaning controls.  *See Genuine Enabling Tech. LLC*, 29 F.4th at 1374; *Tech. Props. Ltd.*, 849 F.3d at 1358.

### ii.  "video channels"

BE Labs contends that the term "video channels" should be construed to mean "programming channels for playback of program content."  Ubiquiti contends that the term should be construed to mean "one or more [RF channels] separate from the bi-directional wideband data pipe and dedicated to broadcasting [video signals]."  For the reasons below, "video channels" is construed to mean "one or more distinct channels used to broadcast video signals."[5]

---

[5] The Texas case construed "video channels" to mean "one or more distinct channels dedicated to broadcasting [video signals]."  *BE Labs, Inc.*, ECF No. 52, at 13.  In doing so, the court rejected Plaintiff's proposed construction, which mirrors their suggestion here.  *Id.* ("programming channels for playback of program content").

18

The term is used in Claim 1 of the '581 Patent: "end units communicate simultaneously with the wireless multimedia center, via a separate bi-directional wideband data pipe (WDP) which provides, as demanded, control for the *video channels*, data transfer, or plain old telephone service" (emphasis added). The claim language distinguishes between (1) the "video signals" that are broadcast from the wireless multimedia center "via one or more separate and dedicated RF channels to one or more end units" and (2) the "video channels" that are controlled over a separate WDP. Read in context, a person of ordinary skill in the art would understand "video channels" to be the channels over which video signals are broadcast and that are subject to control via the WDP, rather than a different type of signal or data path.

The specification is consistent with that understanding. Claim 1 recites that "the video signals are broadcast from the wireless multimedia center via one or more separate and dedicated RF channels to one or more end units," and later states that the separate WDP "provides, as demanded, control for the video channels, data transfer, or plain old telephone service." The figures likewise depict the wireless multimedia center distributing multiple TV channels to video end units, while the WDP handles control and other data paths. Taken together, this record supports construing "video channels" as channels used for broadcasting the video signals that the wireless multimedia center sends to the end units, not as a new category of "programming channels" or a separate data type.

Plaintiff's proposed reference to "programming channels for playback" is not adopted because it introduces new terminology (e.g., "programming" and "playback") that adds ambiguity. Defendant's construction is rejected because it merely repeats and reasserts the construction rejected above for "one or more separate and dedicated RF channels to one or more units." Because the claim language makes clear that "video channels" are the broadcast channels

19

used for visual content, no additional limitation is warranted.  The parties' proposed

constructions are therefore rejected.

### C.  The '183 Patent's Terms

Claim 1 of the '183 Patent states:

> We claim:
>
> 1. A multimedia device for use in an indoor, multi-room, home or business, building environment, comprising:
>
>    a distribution box located in one of the rooms of the indoor, multi-room, building environment and having at least one input for receiving a signal from at least one of a wireless source and a wired source, the signal having at least one of an **audio component** and a **video component**; and
>
>    an orthogonal frequency division multiplexing (OFDM) transceiver operatively connected to the at least one input of the distribution box, and operative for wirelessly and **unidirectionally broadcasting the signal** using a OFDM modulation inside the indoor, multi-room, building environment from the distribution box in the room in multiple directions to a plurality of end units, at least one of the end units being located in another room separated by a wall from the one room of the indoor, multi-room, building environment, the at least one end unit receiving the unidirectionally **broadcast** signal through the wall via packets each having a width of sufficient duration to resist multi-path reflection and absorption phase induced losses.

### i.  "audio component"

BE Labs contends that the term "audio component" should be construed to mean "the

portion of a signal containing sound information."  Ubiquiti contends that the term should be

construed to mean "not 'broadband communication data.'"  For the reasons below, "audio

component" is construed according to its plain meaning as "the portion of a signal containing

sound information."

The claim language and specification confirm that "audio component" is the sound

portion of a composite signal, distinguishable from the video portion.  Claim 1 recites a "signal

having at least one of an audio component and a video component," indicating each

20

"component" is a part of the overall signal -- with "audio component" being the sound portion. By using the conjunction "or," the specification also contemplates that the video and audio signals can be separate ("signals include video or audio signals and broadband data" (emphasis added)). The intrinsic evidence supports construing "audio component" to mean "the portion of a signal containing sound information."

Defendant's arguments to the contrary are unavailing. Ubiquiti's proposed construction appears to stem from a distinction in the patents between audio/video signals and broadband communication data. *See, e.g.*, '581 Patent, cl. 1 ("video and/or audio signals (hereinafter video) and/or broadband communication data"). Those provisions may indicate that the patents treat streaming audio/video differently from broadband communication data, but they do not redefine the ordinary meaning of "audio component." The intrinsic record shows only that audio/video signals and broadband communication data are different categories of traffic, not that "audio component" is defined as "anything that is not broadband communication data." There is no basis to import Ubiquiti's negative limitation into the term "audio component." The term is construed according to its plain meaning.

### ii. "video component"

BE Labs contends that the term "video component" should be construed to mean "the portion of a signal containing visual information." Ubiquiti contends that the term should be construed to mean "not 'broadband communication data.'" "Video component" parallels "audio component" in Claim 1. For the same reasons explained above, "video component" is construed to mean "the portion of a signal containing visual information" for the '183 Patent.[6]

---

[6] Similar terms were construed above for the '581 Patent. "Video component" construed for the '581 Patent refers to a portion of a composite signal, whereas "video signal" describes an entire

### iii.  "broadcast"

BE Labs contends that the term "broadcast" should be construed to mean "to transmit digital data packets in one direction, with no hand-shaking mechanism for each digital data packet."  Ubiquiti contends that the underlined additions should be imported, and the term should be construed to mean: "broadcast is: to transmit all digital data packets of data in one direction, with no hand-shaking mechanism for any digital data packet without using a network protocol."  The '183 Patent incorporates by reference the '581 Patent and its express definition of "broadcast," which the Court previously construed, *supra* § III.A.i.  Consistent with the construction of the '581 Patent's "broadcast" definition, the definition of "broadcast" in the '183 Patent is construed to mean "to transmit digital data packets [of data] in one direction, with no hand-shaking mechanism for each packet."[7]

### iv.  "unidirectionally broadcasting the signal"

BE Labs contends that the phrase "unidirectionally broadcasting the signal" should be construed to mean "broadcasting a signal in a specific spatial direction."  Ubiquiti contends that the phrase should be construed to mean "transmitting all digital data packets of data in one direction, with no hand-shaking mechanism for any digital data packet without using a network protocol."  For the reasons below, "unidirectionally broadcasting the signal" is construed to mean "broadcasting the signal in one direction."[8]

---

stream or transmission.  While "video signal" may at times encompass audio, "video component" in the '183 Patent is limited to visual information as the audio and video are expressly described as separate components.  This distinction is consistent with the claim's disjunctive structure ("an audio component and a video component") and the specification's differentiation between the two ("transmission of the video/audio"), ("the signals include video or audio signals").

[7] This term was not disputed in the Texas case.

[8] This construction is consistent with the Texas case's construction of "unidirectionally broadcasting the signal."  *See BE Labs, Inc.*, ECF No. 50, at 3.

22

The claim language and specification confirm that "unidirectionally broadcasting the signal" reinforces the one-way nature of "broadcast."  The Court applies the same definition of "broadcast" from the '581 Patent.  Because the '183 Patent incorporates the earlier patent by reference and contains no contrary language or context indicating a different usage, the parent patent's definition of "broadcast" applies here as well, and the word "unidirectionally" simply modifies that definition.

Both parties' proposed constructions miss the mark.  While Plaintiff's argument evolved over the course of its briefing, its proposed construction appears to construe "unidirectionally" as referring to spatial directionality.  This contradicts both the plain meaning of the term and the claim language, which expressly provides that the broadcast signal is transmitted "in multiple directions to a plurality of end units."  This confirms that "unidirectionally" refers to the direction of communication flow -- i.e., one-way transmission from sender to receiver -- rather than to any particular physical orientation or spatial pathway.  Ubiquiti seeks to add "without using a network protocol," but nothing in the claims, specification or prosecution history mentions or disclaims "network protocols."  The addition would import extrinsic limitations that the patent never discusses.  Because the intrinsic record already supplies the full scope of "unidirectionally broadcasting," Ubiquiti's proposal adds unsupported limitations and is not grounded in the intrinsic record.  The phrase "unidirectionally broadcasting the signal" is instead construed to mean "broadcasting the signal in one direction."

## IV.    CONCLUSION

The ten terms in dispute shall be construed as stated above.  The parties shall proceed according to the deadlines set forth in the Patent Case Management Plan and Scheduling Order at Dkt. No. 24.

By **January 29, 2026**, the parties shall file a joint letter per the Individual Rules proposing next steps, including any proposal for summary judgment briefing.

Dated: January 15, 2026
      New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**